**Steven A. SAMUEL, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.**

No. 02–C–0569.

United States District Court, E.D. Wisconsin.

Dec. 23, 2003.

---

Nora Sheehan Barry, Penelope C Fleming, U.S. Dept. of Justice (ED-WI), Office of the U.S. Atty., Milwaukee, WI, for Commissioner Soc. Sec. Admin.

Frederick J. Daley, Jr., Daley DeBofsky & bryant, Chicago, IL, for Steven A. Samuel, Plaintiff.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Steven Samuel applied for social security disability benefits, claiming that he was unable to work due to low back and neck pain, shoulder and elbow injuries, and depression. His application was denied initially and on reconsideration. Plaintiff sought and obtained a hearing before an Administrative Law Judge ("ALJ"), but the ALJ also concluded that he was not disabled. The Appeals Council denied plaintiff's request for review, and the ALJ's decision thus became the final decision of the Commissioner of the Social Security Administration.

Plaintiff then brought the present action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). The action was assigned to a magistrate judge for pretrial proceedings. However, the parties did not consent to the exercise of jurisdiction by the magistrate so he could only make a recommendation on plaintiff's appeal.

On October 14, 2003, the magistrate judge recommended that the ALJ's decision be affirmed. Plaintiff objects to the recommendation, and the matter is now before me for decision.

## I. APPLICABLE LEGAL STANDARDS

### A. Disability Standard

In order to obtain benefits under the Social Security Act, the claimant must be disabled, that is, he must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant must show that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has adopted a sequential five-step test for determining whether a claimant is disabled. See 20 C.F.R. §§ 404.1520; 416.920. Under this test, the Commissioner must deter-

mine: (1) whether the claimant is presently unemployed; (2) if so, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether any of the claimant's impairments are listed by the Administration as being so severe as to preclude substantial gainful activity;[1] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work; and (5) if not, whether the claimant is able to perform any other work in the national economy in light of his age, education and work experience. *E.g., Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.2000); *Rucker v. Chater,* 92 F.3d 492, 494 (7th Cir.1996).

The claimant will automatically be found disabled if he makes the requisite showing at steps one through three. *See Henderson ex rel. Henderson v. Apfel,* 179 F.3d 507, 512 n. 3 (7th Cir.1999). If the claimant is unable to satisfy step three, he must then demonstrate that he lacks the RFC to perform his past work. *Id.* If he makes this showing, the burden shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. *Id.* The Commissioner may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of his limitations, or through the use of the "Medical–Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2. *See Heckler v. Campbell,* 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). The Grid is a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. *See Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987); *see also Heckler,* 461 U.S. at 461–62, 103 S.Ct. 1952; *Caldarulo v. Bowen,* 857 F.2d 410, 413 (7th Cir.1988).

However, the Commissioner may not rely on the Grid if the person's attributes do not correspond precisely to a particular rule, *see Caldarulo,* 857 F.2d at 413, or if non-exertional limitations (e.g., pain, or mental, sensory or skin impairments) might substantially reduce the claimant's range of work, *see Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001) (citing *Luna v. Shalala,* 22 F.3d 687, 691 (7th Cir.1994)). In such a case, the Commissioner must solicit the testimony of a VE, *Herron v. Shalala,* 19 F.3d 329, 337 (7th Cir.1994), although she may use the Grid as a "framework" for making a decision, *see* 20 C.F.R. § 404, Subpt. P, App. 2, § 200.00(e)(2).

## B. Standards of Review

### 1. Magistrate Judge's Recommendation

■ Where a party timely objects to a magistrate judge's recommendation, I conduct a de novo review of the objected-to portions, 28 U.S.C. § 636(b)(1); *see United States v. Raddatz,* 447 U.S. 667, 673–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), and may review de novo any other aspects as I see fit, *see Delgado v. Bowen,* 782 F.2d 79, 81–82 (7th Cir.1986). Based on plaintiff's objection, I will conduct a de novo review.

### 2. ALJ's Decision

Under § 405(g), a district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the court's review of the ALJ's the decision is limited, and the ALJ's factual findings must be upheld if supported by substantial evidence. 42 U.S.C. § 405(g); *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable mind would accept as adequate

---

1. These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings").

to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir.2000). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. *Young v. Sec'y of Health & Human Servs.,* 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review " 'must be more than an uncritical rubber stamp.' " *Delgado,* 782 F.2d at 82 (quoting *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984)).

Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir.2000); *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Binion,* 108 F.3d at 782.

If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir. 1989). The ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse

into his reasoning. *Zurawski,* 245 F.3d at 889. "Even if enough evidence exists in the record to support the decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.' " *Hodes v. Apfel,* 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (1996)). Finally, ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 970.

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application and Administrative Decisions

Plaintiff applied for benefits on June 3, 1997,[2] claiming that he was disabled by back, neck and arm pain, a rotator cuff injury, and depression. (Tr. at 65–82.) He alleged a disability onset date of August 14, 1996. (Tr. at 89.) Plaintiff stated that he tried working part-time in January 1997 but had to leave due to his disability. (Tr. at 89.)

The Administration denied the application (Tr. at 44), concluding that while plaintiff's physical problems would preclude heavy labor they did not prevent him from working, and that he had no severe psychological impairment (Tr. at 47). Plaintiff filed a request for reconsideration (Tr. at 51), but the Administration again denied his claim (Tr. at 45), stating that plaintiff was able to perform light and medium work (Tr. at 56). Plaintiff then requested a hearing (Tr. at 60), and on February 10, 1999 he appeared before ALJ John H. Pleuss.

---

**2.** The record refers to a previous application, which was denied in 1977, but contains no details. (Tr. at 93.)

## B. Hearing Testimony

Plaintiff and VE Leslie Goldsmith were the only witnesses at the hearing. Plaintiff was represented by counsel.

### 1. Plaintiff's Testimony

Plaintiff testified that he was 45 years old, had completed the eleventh grade in high school, and had not obtained a GED. (Tr. at 446.) However, he indicated that he had taken a course in diesel mechanics and automobile transmission repair at MATC in 1972 and 1973. (Tr. at 447.) He testified that he was married and had two children, ages four and thirteen. He stated that he was five feet eleven inches tall and weighed 200 pounds. (Tr. at 448.)

Plaintiff indicated that he had worked at Oshkosh Truck Corporation from 1984 to August 14, 1996. He stated that he last worked on the "protech deck" drying parts before they went into the paint booth. (Tr. 449–50.) He was on his feet about five hours per day when performing this job. He indicated that this was a light duty job assigned because of his back problems. (Tr. at 450.)

Previously, he worked in "inspection manufacturing" from about 1991 to 1996, which required him to measure parts and reject those that were not up to par. (Tr. at 451.) He indicated that in this job he was at times required to lift up to 50 pounds; for weights over 50 pounds a crane was used. (Tr. at 452.) Plaintiff spent about six hours per day on his feet on this job. (Tr. at 452.)

Prior to that, he worked from 1984 to 1991 doing assembly work and truck testing for Oshkosh Truck. (Tr. at 452.) This work required him to lift parts up to 50 pounds manually; a crane was used for heavier parts. (Tr. at 453.) This job also required plaintiff to be on his feet six or seven hours per day. (Tr. at 454.)

Prior to working for Oshkosh, plaintiff was lead worker at a transmission rebuilding business. (Tr. at 455.) This job required him to lift parts up to 100 or 180 pounds. (Tr. at 455.)

Regarding his medical conditions, plaintiff testified that he had low back injuries going back to 1985 or 1986. He indicated that he left work in August of 1996 due to low back pain. (Tr. at 456.) He also indicated that he was involved in a motor vehicle accident in October of 1996 in which he injured his neck. (Tr. at 456.) He stated that he eventually had to have cervical fusion and decompression surgery. (Tr. at 456–57.) Plaintiff testified that he still had problems with his neck, including headaches two to three times per week, for which he took medication. (Tr. at 460.) He stated that the pain would radiate down his arms, to the elbow on the left side and to the hand on the right side. (Tr. at 462.)

Plaintiff indicated that he had also undergone three previous surgeries to his lower back.[3] (Tr. at 457.) He stated that he continued to have low back pain "[p]retty much all the time." (Tr. at 462.) At times, the pain would radiate down his legs. (Tr. at 462.) He testified that he recently had an "epidural pump" drug delivery device installed, which he was wearing at the hearing and which relieved some symptoms, but which made him nauseous and drowsy. (Tr. at 463–64, 466.)

Plaintiff further testified that he tore his rotator cuff during swim therapy for his back, which also required surgery. (Tr. at 458.) He indicated that he still experi-

---

**3.** The record reveals that these surgeries were for the removal of lipoma (fat cells). (*E.g.,* Tr. at 341.)

enced loss of strength and range of motion to the shoulder. (Tr. at 458–59.)

Plaintiff also testified that in the early 1990s he had three left elbow surgeries. (Tr. at 459.) He stated that as a result three of his fingers were numb (Tr. at 459), and that he had trouble gripping things (Tr. at 466). He further testified that he also had three surgeries on his knees, the last in June of 1998. (Tr. at 459–60.)

Plaintiff stated that at times he had to lay down during the day because his back and neck hurt. He said that he could sit for thirty to forty-five minutes at a time, stand for maybe an hour, and walk for two or three blocks. (Tr. at 465.) He indicated that the epidural pump improved his ability to do these things. (Tr. at 466.)

Plaintiff testified that he normally awoke at about 8:00 a.m. On Tuesdays and Thursdays he would take and fetch his daughter from school, about a fifteen minute drive. (Tr. at 467.) On other days he would attend doctor's appointments. He testified that it would take him about two hours to drive to a doctor's appointment in Milwaukee from his Wautoma home, but sometimes it actually took three or four hours because he had to stop due to back pain. (Tr. at 467–68.) When his daughter would not go to school, he would supervise her while she played outside. He would then prepare lunch for her. (Tr. at 468.) Sometimes he would clean the house or get supper started before his wife came home. (Tr. at 469.) He would vacuum one room if feeling up to it. (Tr. at 469–70.) He did not take out the garbage and only occasionally did the grocery shopping. (Tr. at 470.) Plaintiff testified that at times he had trouble getting dressed, putting on socks for example. (Tr. at 472.)

Plaintiff testified that before his neck surgery he would read but that he had trouble concentrating since the surgery. (Tr. at 471.) He stated that he spent his time in the evening watching television and sitting in the hot tub. (Tr. at 471.)

## 2. VE Testimony

VE Goldsmith testified that plaintiff's inspection job was medium, skilled work; the assembly and testing jobs were medium, semi-skilled work; and the transmission rebuilding job was medium, skilled work. (Tr. at 474.) He testified that aside from perhaps the assembly job, none of the skills plaintiff acquired doing these jobs would be transferable to light work. (Tr. at 474.) The ALJ then asked the following hypothetical:

> I want you to assume an individual of the claimant's age, education and prior work experience. Assume this individual is limited to light work exertionally. Further assume the individual's precluded from any crawling or kneeling or climbing ladders or scaffolds. Also assume the individual is precluded from more than occasional stooping, bending and crouching. Also assume the individual would need a sit/stand option so that he wouldn't have to sit for more than thirty minutes at a time or stand for more than one hour at a time. Finally, assume that the individual is precluded from more than occasional handling or fine manipulation with his left hand and assuming the individual is right hand dominant. Considering these factors are you aware of any jobs existing in the state of Wisconsin that such individual could perform?

(Tr. at 474–75.) The VE testified that there were 2000 mail clerk jobs, 9000 file clerk jobs, 50,000 general office clerk jobs, 11,000 security guard jobs, and 25,000 small part or bench assembly jobs such a person could perform. (Tr. at 475.)

On cross-examination, the VE stated that if the individual could perform only sedentary work, the mail clerk, file clerk

and some of the general office clerk positions would be eliminated. All but about one quarter of the security guard jobs and one-half of the assembly jobs would also be eliminated. (Tr. at 476.) If the person would be absent from work more than twice per month, all of the jobs would be eliminated. (Tr. at 476.) If the person was limited to sedentary work and had to lie down during the course of an eight hour day, all substantial gainful employment would be eliminated. (Tr. at 477.) Finally, if the individual in the ALJ's hypothetical occasionally got drowsy or vomited on the job, all competitive work would be eliminated. (Tr. at 477–78.)

## C. Medical Evidence

The ALJ received medical evidence from 12 treating or examining sources, as well as reports from four consultants for the Administration.

### 1. Dr. Heydarpour

Plaintiff's longest treating relationship was with Dr. Heydarpour. Plaintiff first saw Dr. Heydarpour on October 2, 1996, complaining of low back pain. Plaintiff indicated that on July 22, 1996 as he was working he felt a "snap" in his lower back. Plaintiff saw an orthopedist, Dr. Bryant, who gave him a trigger point injection and a prescription for percocet, with little relief. Plaintiff started physical therapy and received treatment from a chiropractor, Dr. Bergmann, but his symptoms persisted. Plaintiff stated that the last day he worked was August 14, 1996. (Tr. at 177.)

On examination, Dr. Heydarpour noted tenderness along the L4–5 region, decreased sensation of the lower extremities, and difficulty walking heel to toe. Dr. Heydarpour's diagnosis was low back pain with radiculopathy suggestive of discogenic etiology. He provided plaintiff with a lumbar epidural steroid injection. Plaintiff was also advised to participate in swimming therapy and was provided with pain medication. (Tr. at 176.)

On October 7, 1996, plaintiff advised Dr. Heydarpour that some of his symptoms had improved since the epidural. (Tr. at 175.) Plaintiff returned on October 9 and received another injection. (Tr. at 175.) Plaintiff again saw the doctor on October 14 and complained of severe lower back pain. He requested another injection, but the doctor thought it too soon. On October 17, the doctor performed another epidural injection. (Tr. at 174.) Plaintiff spoke to Dr. Heydarpour on October 21 and noted only transient improvement of his symptoms. Plaintiff requested pain medication on October 23, and Dr. Heydarpour provided a prescription for Oxycodone. (Tr. at 174.) On October 24 plaintiff advised that the Oxycodone was ineffective, and the doctor prescribed Percocet. (Tr. at 173.) On October 25, plaintiff reviewed physical therapy exercises with the doctor and received a refill of Percocet. (Tr. at 173.)

Plaintiff returned on November 1 and noted that he had started swimming therapy but had noticed pain in his right shoulder. The doctor provided a trigger point injection. (Tr. at 173.) On November 4, plaintiff advised that his back pain persisted, but the shoulder was somewhat improved. He was advised to continue therapy. (Tr. at 172.) On November 11, plaintiff returned, complaining of back pain with radiation to the lower extremity. He requested a repeat injection, but the doctor advised him to continue his therapy. (Tr. at 172.) On November 15, plaintiff stated that his symptoms had improved somewhat with therapy but that he wanted a repeat injection, which Dr. Heyparpour provided. Plaintiff also requested a referral to an orthopedic surgeon. Dr. Heydarpour sent him to Dr. Frank. (Tr. at 172.) Dr. Frank advised plaintiff that he

was not a surgical candidate and recommended that he continue his therapy. On November 22, Dr. Heydarpour provided a referral for physical therapy. (Tr. at 171.)

Plaintiff returned on Dr. Heydarpour on November 25 and noted that he had been advised that he needed to return to work (ostensibly by his employer or its workers compensation carrier). Dr. Heydarpour encouraged plaintiff to try working. (Tr. at 171.) On November 27, plaintiff complained of recurring pain in the right shoulder, and Dr. Heydarpour provided an injection. (Tr. at 171.)

Plaintiff attempted to return to work on December 3 and 4 but experienced severe pain and was unable to continue. (Tr. at 170.) On December 6, he returned to Dr. Heydarpour. The doctor stated that he did not believe further injections were warranted and advised plaintiff to continue his therapy. (Tr. at 170.)

Plaintiff noted continued shoulder pain on December 9 and was provided another injection. The pain persisted, so Dr. Heydarpour ordered an MRI and referred him to Dr. Yoder, an orthopedic surgeon. (Tr. at 169.) Dr. Yoder advised plaintiff that he was not a surgical candidate and that his shoulder symptoms could improve with therapy. (Tr. at 168.) On December 20, Dr. Heydarpour provided a four hours per day work restriction. (Tr. at 168.)

Plaintiff returned to Dr. Heydarpour on December 23 and indicated a recurrence of lumbar and cervical spine symptoms. Dr. Heydarpour ordered a cervical MRI and provided an epidural injection to the area. (Tr. 168.) Plaintiff returned on December 30, complaining of severe shoulder pain. Dr. Heydarpour provided an injection. (Tr. at 167.)

On January 7, 1997, plaintiff advised that he was working half days. He had seen Dr. Yoder and was referred to Dr. An for an evaluation of his cervical area. His physical therapy for the low back had been suspended until resolution of his cervical condition. (Tr. at 167.) Plaintiff returned on January 15 and advised that Dr. Yoder had recommended surgical repair of his shoulder. (Tr. at 167.)

On January 21, plaintiff advised Dr. Heydarpour that his new insurance would not cover the doctor's services. (Tr. at 168.) However, plaintiff returned on March 11, 1997, noting recurrence of symptoms in the cervical spine. Dr. Heydarpour provided an injection. On April 7 and 19, plaintiff advised that his cervical symptoms persisted. (Tr. at 166.) Dr. Heydarpour prescribed new medications, but plaintiff's symptoms persisted in May and June 1997. (Tr. at 165.)

On June 18, 1997, plaintiff returned, complaining of a recurrence of cervical and lumbar symptoms. Dr. Heydarpour administered another injection. (Tr. at 293.) Plaintiff returned on July 26 and indicated that he had no improvement. Dr. Heydarpour advised him to continue his therapy. (Tr. at 293.) Plaintiff again saw the doctor on July 2, complaining of persistent headaches. Dr. Heydarpour indicated that plaintiff's symptoms were not suggestive of spinal headache and advised him to continue a biofeedback therapy program he had started with Dr. Tyre. (Tr. at 293.)

Plaintiff returned on July 21, 1997, indicating that his headaches had waxed and waned in intensity. His pain medications were only minimally effective. He stated that his pain had prevented him from engaging in daily activities. Dr. Heydarpour advised plaintiff to continue his biofeedback and chiropractic therapy, and provided a prescription for Percocet. (Tr. at 412.)

Plaintiff next saw the doctor on August 1, 1997, stating that his pain was worse and that he was considering surgical intervention. (Tr. at 412.) On August 11, 1997, plaintiff told the doctor that his

symptoms were controlled with medication, and that he was to see Dr. An regarding his cervical spinal condition. Dr. Heydarpour provided another prescription.

On August 16, 1997, plaintiff underwent an MRI of the cervical spine, which revealed multilevel degenerative disc disease, with a moderate disc herniation at C6–7, severe bony right-sided lateral spinal stenosis at C5–6, and moderate left-sided lateral spinal stenosis at C3–4, C4–5 and C5–6. (Tr. at 308.) On August 26, 1997, plaintiff returned to see Dr. Heydarpour and requested a repeat epidural injection for his cervical spinal symptoms. Dr. Heydarpour administered the injection and reviewed the results of plaintiff's MRI. (Tr. at 412.)

Plaintiff returned on September 5, 1997, stating that his cervical pain had improved but noting the presence of pain in his interscapular region and in his right shoulder. Dr. Heydarpour suggested an MRI of the thoracic region and administered an injection to plaintiff's right shoulder. (Tr. at 411.)

Plaintiff next saw Dr. Heydarpour on September 12, 1997, stating that his symptoms persisted. He received another epidural injection. (Tr. at 411.)

Plaintiff returned on September 24, 1997, and indicated that he had been scheduled for cervical spine surgery. He stated that his symptoms persisted. Dr. Heydarpour referred him to Dr. Mueller for a second opinion. (Tr. at 410.) On September 29, 1997, plaintiff received another epidural injection. (Tr. at 410.)

Plaintiff returned on October 3 and requested another epidural, but Dr. Heydarpour demurred, suggesting that plaintiff complete his surgical evaluation first. (Tr. at 409.) Plaintiff again saw the doctor on October 20, stating that his lumbar and cervical symptoms were exacerbated. Dr. Heydarpour provided a prescription for OxyContin and Percocet. (Tr. at 409.) Plaintiff then saw Dr. Mueller, who recommended cervical spinal surgery but suggested that plaintiff first decrease his use of analgesic medications. (Tr. at 409.)

Plaintiff returned to Dr. Heydarpour on November 3 and stated that he had significant difficulty with lack of medication. Dr. Heydarpour provided a prescription for Percocet. (Tr. at 408.)

Plaintiff next saw Dr. Heydarpour on November 10, indicating that he had stopped using OxyContin but continued with use of Percocet. He stated that his cervical symptoms were no longer tolerable and he requested another epidural, which Dr. Heydarpour provided. (Tr. at 408.) Plaintiff reported some relief on November 18. (Tr. at 408.) On November 25, plaintiff reported pain in the left shoulder and received an injection to that area. (Tr. at 407.) In December 1997, plaintiff underwent cervical fusion surgery with Dr. Mueller. (Tr. at 407.)

Plaintiff next spoke to Dr. Heydarpour on January 16, 1998, indicating that he had completed the surgery but his symptoms persisted. (Tr. at 407.) Dr. Heydarpour recommended that plaintiff continue with the therapy program prescribed by Dr. Mueller. (Tr. at 406.)

Plaintiff returned to Dr. Heydarpour on February 23, 1998, complaining of persistent cervical spine symptoms. He also complained of exacerbation of his lower back pain and radiation to his legs. Dr. Heydarpour encouraged him to start hydrotherapy. (Tr. at 406.)

Plaintiff next saw Dr. Heydarpour on April 9, 1998, stating that his cervical symptoms were unchanged. He also complained of continued lower back pain. (Tr. at 406.) Dr. Heydarpour provided a lumbar epidural injection. (Tr. at 405.) The injection provided relief for a time, but the

pain recurred and plaintiff returned to Dr. Heydarpour on May 11, 1998. Dr. Heydarpour encouraged him to continue with hydrotherapy and a weight reduction program. (Tr. at 405.)

Plaintiff returned on May 22, 1998 and stated that his symptoms persisted. Dr. Heydarpour provided a prescription. (Tr. at 404.) Plaintiff again saw Dr. Heydarpour on June 9, 1998, and again complained of cervical spinal pain. Dr. Heydarpour prescribed Percocet. (Tr. at 404.) On June 19, Dr. Heydarpour provided another cervical epidural injection. (Tr. at 403.) On July 6, he provided a lumbar injection. (Tr. at 403.) On July 15, plaintiff continued to complain of headache symptoms, and Dr. Heydarpour provided an injection of the bilateral greater occipital nerve region. (Tr. at 402.) But when plaintiff returned on July 21, he noticed no improvement and another injection was provided. (Tr. at 401–02.) Yet another injection was provided on August 19, 1998. (Tr. at 401.) Plaintiff then reported some improvement in his headache and cervical spine symptoms. (Tr. at 400.) But by September 9, the pain was back and so another injection was provided. (Tr. at 400.) On September 18, plaintiff reported no improvement from the latest injection. (Tr. at 400.)

Plaintiff returned on September 30, 1998, complaining of increased diffuse pain in the knees, shoulders, and cervical and lumbar spine. He also complained of more frequent headaches. Dr. Heydarpour provided a prescription for Percocet. (Tr. at 399.)

Plaintiff next saw the doctor on October 9, stating that his lower back pain was worse. He stated that he was interested in proceeding with a trial of neuroaxial analgesia and also received a repeat lumbar epidural injection. (Tr. at 399.) On October 16, plaintiff complained of pain in the interscapular region and again expressed interest in a trial of neuroaxial analgesia. (Tr. at 399.) Dr. Heydarpour injected the scapular area. (Tr. at 398.) On October 23, plaintiff received an injection to the cervical area. (Tr. at 398.) But on October 29 the cervical pain was increased and another injection was administered. (Tr. at 397–98.) On November 3, plaintiff returned complaining of headaches and an injection of the greater occipital nerve region was administered. (Tr. at 397.) On November 11, he returned stating that pain relief from the injections was only temporary. (Tr. at 396–97.) Yet another injection was administered. (Tr. at 396.)

Plaintiff returned on November 30, complaining of pain along the lower thoracic spine. The area was injected. (Tr. at 396.) On December 7, 1998, plaintiff stated that his symptoms had persisted and that he wanted to proceed with a neuroaxial analgesia trial. The device was put in place on December 17, 1998 at Elmbrook Hospital.[4] (Tr. at 395.) Plaintiff noted no relief so the infusion level was increased several times. (Tr. at 395.) By December 20, 1998, plaintiff noted some improvement. (Tr. at 394.)

On December 17, 1998, Dr. Heydarpour completed a Residual Functional Capacity Questionnaire in which he indicated that plaintiff's diagnoses were lumbar disc disease, cervical disc disease, bilateral shoulder pain and knee injuries. He identified plaintiff's symptoms as knee, shoulder and low back pain, and cervical and lumbar radiculopathy. He identified the following objective signs of plaintiff's pain: significantly reduced range of motion, tenderness, crepitus, spasm, impaired sleep and

---

4. This device was apparently put in place on a trial basis prior to installation of the drug delivery pump about which plaintiff testified at the hearing. (*See* Tr. at 413.)

muscle weakness. (Tr. at 390.) Dr. Heydarpour indicated that plaintiff was not a malingerer and that his impairments could reasonably be expected to produce his symptoms. He indicated that plaintiff could continuously sit for 20 minutes and stand for 15 minutes, after which he had to stand or lie down for 30 minutes. He stated that plaintiff could walk one block without rest or severe pain. (Tr. at 391.) During an eight hour day, Dr. Heydarpour stated that plaintiff could sit and stand/walk less than two hours. He stated that plaintiff could not get through an eight hour day on a sustained basis without lying down. He opined that plaintiff could occasionally lift less than 10 pounds and never more than that. He also stated that plaintiff had significant limitations in reaching overhead and could bend and twist only occasionally. (Tr. at 392.) He further stated that on average plaintiff would be absent more than twice per month due to his impairments. He also stated that plaintiff's medications could impair his mental functioning. (Tr. at 393.)

### 2. Dr. Yoder

Plaintiff saw Dr. Yoder for surgery to his right shoulder on January 25, 1997. (Tr. at 179.) Dr. Yoder's notes relate that plaintiff injured his shoulder while swimming, feeling a tearing sensation. An MRI revealed a rotator cuff tear. (Tr. at 179–80.) Dr. Yoder indicated that conservative treatment had failed, requiring surgical repair. (Tr. at 180–81.) Plaintiff underwent physical therapy following the surgery and made some progress, although he continued to complain of pain, lack of stamina and endurance, and loss of motion.[5] (Tr. 252–53.) In a September 10, 1998 letter, Dr. Yoder opined that plaintiff had permanent partial disability of 12% to the right shoulder based on lack of

stamina, endurance, pain and clicking, and some restricted motion. (Tr. at 419.)

### 3. Dr. Bergman

Plaintiff briefly treated with chiropractor Donald Bergman in November and December 1995. (Tr. at 197.) In August of 1996 he began regular treatment with Dr. Bergman, receiving manipulation, intersegmental traction and soft tissue therapy through June 1997. However, the treatment notes reveal that plaintiff usually noted little or no improvement in his cervical and lumbar symptoms. (Tr. at 202–49, 189–91, 194–97.)

Dr. Bergman's notes also include the results of an August 28, 1996 MRI of the lumbar spine, which revealed mild disc bulging at L4–5 and L5–S1 but no herniated discs. (Tr. at 200–01.) A December 21, 1996 MRI of the cervical spine revealed "moderate to severe right-sided neural foramen narrowing due to uncal osteophyte formation and some right ventral spinal canal osteophytic ridging" at C5–6. (Tr. at 192.) The MRI also showed a small left-sided herniated disc at C6–C7. (Tr. at 192–93.)

Dr. Bergman completed a report dated December 11, 1996, in which he indicated that plaintiff had been disabled since July 22, 1996 and continued to be unable to work. (Tr. at 199.) He did not list a date that he expected plaintiff could return to work and described plaintiff's prognosis as "guarded." He indicated that plaintiff was engaged in physical therapy and working conditioning, as well as epidural injection therapy with Dr. Heydarpour. (Tr. at 199.)

Dr. Bergman completed another report dated June 19, 1997 in which he indicated that plaintiff had a "moderate limitation of functional capacity" and was capable only

---

**5.** Dr. Graziano's records also discuss the shoulder surgery. (Tr. at 277–79.)

of sedentary work. (Tr. at 188.) He indicated that plaintiff was disabled from July 22, 1996 to the present, and that he did not expect a marked change in the future. (Tr. at 188.) Dr. Bergman concluded: "Patient has permanent spinal injury to include both the cervical and lumbar spine. H[e] has lumbar and cervical discitis and concomitant upper and lower extremity radiculapothy." (Tr. at 188.)

### 4. Dr. Bryant

Plaintiff saw Dr. Bryant, an orthopedist, on June 7, 1996, complaining of back, arm and neck pain. (Tr. at 255.) On examination, Dr. Bryant noted a lump in plaintiff's low back just above the scar near the posterior superior iliac spine, where Dr. Bryant had previously removed fat pads. He injected the area, which provided relief. Dr. Bryant's diagnoses were strain of the dorsolumbar spine; possible radiculopathy, L5, right leg; strain of the cervical spine; and strain of the low back. (Tr. at 255.) He provided a prescription for Percocet and a return to work slip with a 30 pound weight lifting limit. (Tr. at 256.)

Plaintiff returned to Dr. Bryant on July 19, 1996, "in follow up from his incident of 4–17–96."[6] (Tr. at 257.) He was noted to be generally improving and was performing abdominal exercises. Plaintiff indicated that he continued to have discomfort in the low back and the right posterior thigh. Dr. Bryant affirmed his previous diagnoses and recommended various stretching and strengthening exercises. (Tr. at 257.) Plaintiff was continuing to work every day with a 30 pound lifting restriction. (Tr. at 258.)

Plaintiff returned on August 14, 1996, indicating that he had further injured his back lifting at work on July 30. On examination, Dr. Bryant noted pain in the inter-

spinous ligament at L4–5 and soreness on the previous surgical scar areas. His diagnosis was strain of the interspinous ligament of the low back. He provided an injection and allowed plaintiff to continue working with a 30 pound lifting restriction. (Tr. at 259.)

Plaintiff returned on August 20. Dr. Bryant noted that plaintiff had developed severe pain following the last office visit and was excused from work for the rest of the week. The pain was shooting down the right leg laterally and into the lateral calf. Plaintiff stated that he had a hard time sleeping and turning his head and neck. Dr. Bryant advised plaintiff to continue to have maximum rest but wanted him to start physical therapy; he also prescribed Percocet. (Tr. at 261.) Plaintiff was again seen on August 27, had started physical therapy, and was released to return to work on August 28 with a 10 pound lifting restriction. (Tr. at 263.) However, Dr. Bergman then authorized absence from work, with which Dr. Bryant later concurred. (Tr. at 264–65.) Dr. Bryant saw plaintiff on September 5, and plaintiff indicated that he was worse. (Tr. at 265.) Plaintiff stated that he experienced intermittent low back pain and numbness in his left leg. (Tr. at 265.) Plaintiff returned on September 9, and Dr. Bryant suggested that he return to work on September 16, 1996 with a 10 pound lifting restriction. (Tr. at 266.)

Plaintiff again saw Dr. Bryant on September 26 and stated that he had been doing a lot of walking—10 blocks per day—but his legs felt week. He also complained of numbness and tingling in his left arm and fourth and fifth fingers. (Tr. at 267.) He was also experiencing cramping

---

**6.** The record does not explain this incident, but it appears to have been a work-related injury. (Tr. at 260.)

in his foot and pain radiating into his legs. (Tr. at 267.)

On October 4, Dr. Bryant received a report from Covenant Rehabilitation Services, which indicated that plaintiff was taking up to 10 Percocet daily for pain. Plaintiff reported daily pain, and Curative was concerned about his reliance on medication, indicating that he may require chronic pain management. As noted, in October 1996, plaintiff began receiving epidural injections from Dr. Heydarpour. (Tr. at 268.)

On October 14, 1996, plaintiff was involved in a motor vehicle accident in which a school bus backed into his car. (Tr. at 268.) After the accident, plaintiff's neck began to swell up and he felt shooting pains down his right arm from the cervical spine at C6–7. He also felt pain shooting down his legs. (Tr. at 269.) An x-ray revealed slight narrowing of the C5–6 disc space. Dr. Bryant prescribed valium. (Tr. at 269.)

Plaintiff returned to Dr. Bryant on November 5, complaining of continuing pain in the shoulder, back and neck. Dr. Bryant recommended that he continue therapy. (Tr. at 273.) Dr. Bryant's records discontinue after November 11, 1996. (Tr. at 275.) However, on December 23, 1998, Dr. Bryant completed a letter report regarding plaintiff's condition, which contained an extensive history of plaintiff's medical condition and various accidents and injuries. (Tr. at 414–18.)

### 5. Dr. Mueller

Plaintiff first saw Dr. Mueller for his neck injury On October 15, 1997. (Tr. at 434.) Following a review of diagnostic testing which revealed a disc herniation at C6–7, Dr. Mueller recommended surgery. (Tr. at 433.) Dr. Mueller indicated that with the cervical decompression and fusion surgery, plaintiff's arm and neck symptoms should improve. (Tr. at 432.) On December 10, 1997, Dr. Mueller performed a cervical C6–7 disc excision and fusion. (Tr. at 347–48.) X-rays taken following the surgery showed the fusion to be stable. (Tr. at 345–46.) Dr. Mueller saw plaintiff on December 17 and noted that his wound looked good. He encouraged plaintiff start using his treadmill for exercise, reduce the amount of Percocet he was taking, then switch to Darvocet. (Tr. at 430.)

Dr. Mueller saw plaintiff on February 10, 1998 and noted that his wounds looked good and his x-rays showed good evidence of increasing bone fusion. (Tr. at 427.) On March 16, 1998, plaintiff fell and hit his head, which caused numbness from the neck down and some neck pain. However, x-rays showed good alignment of the neck and progression of bone fusion at the level of his operation. (Tr. at 426.)

### 6. Dr. Reddy

On January 21, 1998, plaintiff saw Dr. Reddy on referral from Dr. Mueller regarding his persistent neck, arm and back pain. (Tr. at 340.) Dr. Reddy's impression was one of diffuse myofascial pain in the cervical and upper back associated with residual symptoms of C6–7 radiculopathy; rotator cuff, surgically repaired; history of chronic low back pain; chronic pain syndrome; and hepatitis B carrier. (Tr. at 343.) He opined that plaintiff needed to recover from his recent surgery before commencing any intensive rehabilitation program. He stated that plaintiff was capable of sedentary tasks and that his prognosis for returning to medium or heavy work was poor; however, he could perhaps return to light work once the spinal fusion was stable. (Tr. at 343.)

### 7. Dr. Schultz

Dr. Mueller also referred plaintiff to Dr. Schultz for pain management in April 1998. (Tr. at 425.) Dr. Schultz indicated

that plaintiff reported neck pain, bilateral shoulder discomfort, and lower back pain with numbness to both legs. Dr. Schultz indicated that it was a combination of these problems that prevented plaintiff from engaging in normal activity. (Tr. at 421.) On examination, Dr. Schultz noted significant restrictions in cervical spinal mobility. Plaintiff had full range of motion of the lumbar spine but with pain at the end ranges of all movements and decreased hip internal rotation. Plaintiff also had diffuse pain to palpation over the lumbar spine. His motor strength was normal in all four extremities. (Tr. at 423.)

Dr. Schultz opined that plaintiff did not have a straightforward case of chronic low back pain that would likely benefit from surgery or physical therapy alone. He indicated that the approach taken by Dr. Heydarpour did not foster independent self management of pain and did not result in any clear improvement in his functional abilities. Plaintiff had been taking strong pain medication for many years and was unaware of his physical tolerance for activity. (Tr. at 424.) Dr. Schultz indicated that plaintiff fit the profile of an individual with chronic pain syndrome and required multi-disciplinary help. He suggested a drastically different approach from that of Dr. Heydarpour, including behavioral modification, pacing, realistic expectations regarding pain, relaxation training and consistent aerobic exercise. (Tr. at 424.)

Plaintiff returned to Dr. Schultz on May 19, 1998, and Dr. Schultz noted that the MRI of plaintiff's lumbar spine showed only minimal degenerative changes—a small bulge at L4/5 such as could be expected for a person plaintiff's age. (Tr. at 420.)

### 8. Dr. Rosler

Dr. Rosler saw plaintiff in June 1998, apparently on referral from Dr. Heydarp-our. Dr. Rosler completed a report dated June 9, 1998, in which he discussed plaintiff's medical history in some detail. (Tr. at 362.) He indicated that plaintiff injured his lower back at work in 1985. Plaintiff experienced intermittent back pain since then and had three lipomas removed from his lower back, the last in 1992. Plaintiff injured his right shoulder during swim therapy in 1996 and had to have surgery. He was also involved in a motor vehicle accident with a school bus on October 14, 1996, in which he injured his neck. Plaintiff continued to experience neck pain radiating into his arms after the cervical fusion surgery, as well as headaches. Plaintiff had also undergone three left elbow surgeries and surgeries to both knees due to knee derangement. (Tr. at 362.)

Dr. Rosler indicated that plaintiff's low back pain radiates into the right leg. (Tr. at 362.) He had been treated with epidural injections, and used ice and a hot tub to relieve his symptoms. (Tr. at 363.) Plaintiff indicated that he had difficulty sleeping due to his symptoms and had been taking about 100 Percocet tablets per month. (Tr. at 363.)

On examination, Dr. Rosler noted that plaintiff ambulated with an analogic gait and had reduced range of motion of the cervical and lumbar spines. Dr. Rosler concluded:

> The patient is status-post multiple injuries resulting in multiple surgeries. The most recent ones involving the cervical spine with evidence of disc herniation as noted in the cervical MRI. He is status-post cervical fusion and has continued with radiculopathy. He still has findings consistent with a residual left ulnar entrapment neuropathy at the elbow as well as a right carpal tunnel syndrome. His headaches are most likely of tensional type though he does have a migrainous component. He also has

chronic lower back as well as status-post bilateral knee derangement, the left one is active at this time. He also has a history of cirrhosis of the liver. (Tr. at 364.) Dr. Rosler prescribed Zomig for plaintiff's headaches and scheduled an EMG of the upper extremities. (Tr. at 364.) The EMG was conduced on June 30, 1998 and was consistent with a chronic right cervical radiculopathy. (Tr. at 365.)

Dr. Rosler completed a Residual Functional Capacity Questionnaire on September 17, 1998. (Tr. at 370.) He indicated that plaintiff had significantly reduced range of motion, sensory loss, tenderness and muscle atrophy, which represented objective signs of plaintiff's pain. (Tr. at 370.) He stated that plaintiff was not a malingerer, that emotional factors did not contribute to plaintiff's limitations, that plaintiff's physical impairments could reasonably be expected to produce the subjective symptoms and limitations plaintiff experienced, and that his impairments could be expected to last at least 12 months. (Tr. at 371.)

Dr. Rosler opined that plaintiff could continuously sit or stand 30 minutes, after which he would have to walk, stand or lie down for 10 to 15 minutes. He indicated that plaintiff could walk about five blocks. (Tr. at 371.) He stated that plaintiff could stand/walk less than two hours and sit about four hours out of an eight hour work day. (Tr. at 372.) Dr. Rosler indicated that plaintiff could not get through an eight hour work day without lying down, for a total of about 1/2 hour. He stated that plaintiff could lift 10 pounds occasionally but not more than that. (Tr. at 372.) He also found that plaintiff had significant limitations in grasping and reaching with both arms/hands. (Tr. at 372.) Plaintiff could never bend or twist at the waist and would be absent from work more than twice per month due to his impairments. (Tr. at 373.)

### 9. Lutheran Social Services

Plaintiff began seeing a therapist, Michael Wallace, at Lutheran Social Services in June of 1997 due to depression. (Tr. at 284–87.) Plaintiff indicated that his appetite, motivation and concentration were decreased and his sleep disturbed. (Tr. at 284.) Wallace opined that plaintiff had a Global Assessment of Functioning (GAF) of 51. (Tr. at 287.)

### 10. West Allis Memorial Hospital

Plaintiff was evaluated for biofeedback therapy at West Allis Memorial Hospital on September 16, 1997. Dr. Yanchar's impression was one of adjustment disorder with mixed emotional features secondary to chronic pain. (Tr. at 376.)

### 11. Dr. Nagy/CHN Life Skills

Plaintiff saw Dr. Nagy for psychiatric treatment in November 1998. Dr. Nagy's impression was that plaintiff had a past history of alcohol and drug dependence and a recent history of manic symptoms while taking a medication called Phenterimine. (Tr. at 380.) Dr. Nagy diagnosed plaintiff with major depression and indicated that his GAF was 55–60. (Tr. at 381.) Dr. Nagy referred plaintiff for treatment of his persistent pain syndrome and offered a trial of Zoloft. (Tr. at 381.) Plaintiff then underwent six individual therapy sessions at CHN Life Skills. (Tr. at 383–87.)

### 12. Elmbrook Memorial Hospital

Plaintiff was seen at Elmbrook in June 1998 following an injury to his left knee, which resulted in a tear to the medial meniscus. He underwent arthroscopic surgery on June 22, 1998, performed by Dr. Yoder. (Tr. at 377–78.)

### 13. Consulting Physician Reports

Dr. Ward Jankus examined plaintiff at the behest of the Administration on or about August 25, 1997. (Tr. at 317.) After conducting an examination and taking a medical history, Dr. Jankus concluded that plaintiff had multiple musculoskeletal issues, which limited his ability to work. Dr. Jankus concluded that plaintiff could probably be on his feet two to three hours out of an eight hour day, walk three to four blocks at a time, and sit six out of eight hours with stretch breaks every 30–60 minutes. (Tr. at 320.) He opined that plaintiff could lift 10–20 pounds at the waist level, but that plaintiff could not perform repetitive lifting and carrying above shoulder level due to his rotator cuff injury. Dr. Jankus said plaintiff could not do repetitive pushing and pulling with the upper extremities or repetitive overhead activities. (Tr. at 320.) Dr. Jankus noted that although plaintiff's gross grasping and manipulation remained intact, plaintiff would have difficulty doing precise assembly line type activities. (Tr. at 320.) X-rays ordered by Dr. Jankus revealed a normal lumbar spine and mild degenerative changes in the right hip joint. (Tr. at 322.)

On September 8, 1997 Dr. Bussan completed a Residual Physical Functional Capacity Assessment for the Administration. (Tr. at 323.) He opined that plaintiff could lift 50 pounds occasionally, 25 pounds frequently; sit and stand six out of eight hours; and push or pull in an unlimited manner. (Tr. at 324.) Dr. Bussan stated that plaintiff had no postural or environmental limitations but should avoid frequent overhead reaching. (Tr. at 325–27.)

On September 8, 1997, Dr. Mahlberg completed a Psychiatric Review Technique form for the Administration. (Tr. at 331.) Dr. Mahlberg concluded that plaintiff showed signs of an affective disorder and substance addiction disorder, but that he had no severe impairment. (Tr. at 331.) Dr. Mahlberg found that plaintiff displayed disturbance of mood, characterized by appetite and sleep disturbance, decreased energy, and difficulty concentrating. (Tr. 334.) He also noted a history of alcohol abuse. (Tr. at 337.) However, he concluded that plaintiff had no restrictions in daily living; only slight difficulties in maintaining social functioning; seldom experienced deficiencies in concentration, persistence or pace; and never experienced episodes of deterioration or decompensation in a work-like setting. (Tr. at 338.) Thus, he concluded that plaintiff did not meet Listing 12.04. (Tr. at 338.)

Finally, on April 9, 1998, Dr. McDermott completed a Residual Physical Functional Capacity Assessment for the Administration. (Tr. at 309–16.) Dr. McDermott indicated that plaintiff could occasionally lift up to 50 pounds, 25 pounds frequently; stand and sit six hours in an eight hour work day; and push and pull in an unlimited fashion. (Tr. at 310.) He opined that plaintiff had no environmental or postural limitations (Tr. at 313–14) but was limited in the ability to reach in all directions (including overhead) (Tr. at 313). Dr. McDermott concluded that plaintiff had recovered from his December 1997 cervical spinal fusion surgery and was capable of medium work with no extreme overhead reaching with the right arm. (Tr. at 315.)

### D. ALJ's Decision

On February 25, 1999, the ALJ issued his decision. First, the ALJ determined that plaintiff had not worked since August 14, 1996, the alleged disability onset date. (Tr. at 19.) Next, he found that plaintiff had a severe impairment—C–5 radiculopathy with cervical and lumbar spinal degenerative changes—but that such impairment did not meet or equal any of the Listings. (Tr. at 23.) He also concluded that plain-

tiff suffered from non-severe depression: this condition caused no restrictions on plaintiff's daily activities, slight difficulties in social functioning, seldom caused deficiencies in concentration, persistence or pace, and never caused episodes of deterioration or decompensation in a work-like setting. (Tr. at 24, 33–36.)

In determining plaintiff's RFC, the ALJ concluded that plaintiff's subjective complaints and allegations concerning his limitations and impairments were "not fully credible." (Tr. at 27.) Then, according substantial weight to Dr. Jankus's opinion (Tr. at 28), the ALJ found that plaintiff had the ability to perform a range of light work, but was precluded from more than occasional stooping, bending or crouching, and from any crawling, kneeling or climbing on ladders or scaffolds. He further concluded that plaintiff was precluded from more than occasional handling or fine manipulation with his left hand. Finally, the ALJ found that plaintiff needed a sit/stand option so that he was not required to continuously sit for more than 30 minutes or stand for more than 60 minutes. (Tr. at 30.)

Based on this RFC, the ALJ determined that plaintiff could not return to his past work as an inspector, assembler and transmission rebuilder, because those jobs required medium exertion. (Tr. at 30.) However, relying on the testimony of the VE and using Grid Rule 202.19 as a framework, the ALJ concluded that there were a significant number of other jobs, including mail clerk, file clerk, security guard and bench assembler, that plaintiff could perform. (Tr. at 31.) Thus, he concluded that plaintiff was not disabled. (Tr. at 31–33.)

**E. Appeals Council Review and District Court Action**

Plaintiff asked the Appeals Council to reverse the ALJ's decision, but on April 12, 2002, the Council denied his request. (Tr. at 7–8.) Plaintiff then commenced this action.

## III. DISCUSSION

Plaintiff raises four issues in this appeal. First, he argues that the ALJ's RFC determination was flawed. Second, he argues that the ALJ erred in concluding that he does not suffer from a severe mental impairment. Third, he claims that the ALJ improperly evaluated his credibility. And fourth, he argues that the VE's testimony was unreliable. I address each in turn.

### A. RFC Determination

Plaintiff claims that the ALJ's RFC determination was flawed in several respects.

### 1. ALJ's Findings as to Plaintiff's Exertional Abilities

Plaintiff first argues that the ALJ's findings as to his exertional abilities preclude light work.

The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.

"Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8–hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

SSR 83–10; *see also* 20 C.F.R. § 404.1567(b).

The ALJ found that plaintiff could perform the exertional requirements of light work but needed a sit/stand option so that he would not have to continuously sit for more than 30 minutes or stand for more than 60 minutes. Plaintiff contends that this option would allow him to stand for only 5 to 5.5 hours per day and sit 2.5 to 3 hours per day, which does not meet the level required for light work. Additionally, plaintiff contends, the ALJ precluded him from occasional stooping, which is also required for light work. Thus, plaintiff argues, the ALJ's specific findings do not allow light work.

This argument lacks merit. The ALJ did not find that plaintiff had to sit or stand for any definite period of time upon changing positions. As the Commissioner notes, "nothing in the ALJ's RFC finding prohibits Plaintiff from standing for sixty

minutes, alternating to a seated position for five minutes, and then returning to a standing position for another sixty minutes." (Def. Resp. to Pl. Obj. at 3.) And the ALJ did not preclude plaintiff from occasional stooping, which is required for light work. Rather, he found that plaintiff "is precluded from *more than occasional* stooping." (Tr. at 32, emphasis added.) This is consistent with light work.

■ However, there is a more fundamental problem with the ALJ's RFC determination. As noted, the ALJ concluded that plaintiff was capable of performing the exertional requirements of light work. (Tr. at 32 # 5.) He also included this requirement in his hypothetical question to the VE. (Tr. at 474.) Thus, he found that plaintiff could remain on his feet for a total of about six hours out of an eight hour work day.[7] However, the ALJ provided no medical support for this finding. After assessing the various medical opinions in the record, the ALJ decided to give substantial weight to the opinion of Dr. Jankus (aside from the restrictions on overhead work contained in Jankus's opinion). (Tr. at 28.) But Dr. Jankus stated that plaintiff's "weight bearing capacity is limited in the range of 2–3 hours out of an 8 hour period with breaks once or twice per hour to be able to sit down." (Tr. at 320.) This is insufficient to meet the requirement of light work. Consulting physicians Dr. McDermott and Dr. Bussan both opined that plaintiff could stand six out of eight hours (Tr. at 310, 324), but the ALJ specifically rejected their opinions because they "understate the exertional and non-exertional limitations caused by the claimant's impairments and are inconsistent with the record as a whole." (Tr. at 28.) Plaintiff's doctors did not suggest that he

---

7. The ALJ did include a sit/stand option, but he did not deviate from the standard exertional requirements for light work.

could remain on his feet six out of eight hours.[8] In sum, the ALJ cited no medical support for his conclusion that plaintiff could perform this exertional requirement of light work. *See* SSR 96–8p ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) ....").

Therefore, the matter must remanded for reconsideration of whether plaintiff can meet the standing/walking requirements for light work (and/or additional testimony from a VE as to whether there are any jobs plaintiff can perform consistent with Dr. Jankus's assessment).[9] *See, e.g., Seitz v. Comm'r of Soc. Sec.*, 25 Fed. Appx. 229, 231 (6th Cir.2001) (remanding for consideration of medical evidence that claimant was restricted to two hours of standing in eight hour day); *Alexander v. Barnhart*, 287 F.Supp.2d 944, 967 (E.D.Wis.2003) (reversing where ALJ failed to cite any medical evidence supporting his RFC finding); *Nichols v. Comm'r of the SSA*, 260 F.Supp.2d 1057, 1076 (D.Kan.2003) (reversing where ALJ failed to identify medical evidence supporting RFC determina-

tion); *Herbert v. Barnhart*, No. 00–2417, 2002 WL 31180762, at *14 (D.Kan. Sept. 19, 2002), 2002 U.S. Dist. LEXIS 18615, at *42 (reversing where ALJ failed to cite any specific medical evidence that would indicate where he derived the specific RFC limitations and restrictions); *see also Clifford*, 227 F.3d at 870 ("An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.").

## 2. Dr. Yoder's September 1998 Report

Plaintiff's second argument regarding RFC is that the ALJ ignored the September 10, 1998 report of Dr. Yoder, one of his treating physicians. In that report, Dr. Yoder opined that plaintiff had permanent partial disability of 12% to the right shoulder based on lack of stamina, endurance, pain and clicking, and restricted motion. (Tr. at 419.)

Treating source opinions must be given special consideration in social security cases. *Dominguese v. Massanari*, 172 F.Supp.2d 1087, 1100 (E.D.Wis.2001). If well-supported by medically acceptable

---

8. Dr. Heydarpour opined that plaintiff could stand/walk less than two hours out of an eight hour day. (Tr. at 392.) Dr. Rosler said the same. (Tr. at 372.)

9. It is true that the ALJ did not rely on the Grid based on a finding that plaintiff could perform all aspects of light work without exception. However, the ALJ's hypothetical question to the VE failed to take into account an inability to stand or walk for less than six out of eight hours. Therefore, the omission is significant. *See Herron*, 19 F.3d at 337 (stating that "hypothetical question posed by the ALJ to the VE must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record"). Plaintiff's lawyer asked the VE about the availability of jobs given the ability to do sedentary work, which would allow for more sitting and less standing/walking. However, the ALJ made no findings based on a seden-

tary exertional ability, and it is not the role of the reviewing court to do so. Moreover, even if the VE did testify as to the availability of some jobs given a sedentary work capacity (Tr. at 476), the ALJ also found that plaintiff was precluded from more than occasional handling or fine manipulation with his left hand (Tr. at 30). This could result in severe erosion of the sedentary work base. SSR 96–9p ("Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions."); *see also* SSR 83–10 (noting that unskilled light work generally does "not require use of the fingers for fine activities to the extent required in much sedentary work"). (Recall that although plaintiff's previous work was skilled or semi-skilled, the VE testified that the skills he had acquired were likely non-transferrable. (Tr. at 474.)) Thus, the matter must be remanded for reconsideration of these issues by the ALJ with the assistance of a VE.

clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence, the adjudicator must afford such opinions controlling weight. *Id.* (citing SSR 96–8p). Even if the ALJ finds that the opinion does not warrant controlling weight, the ALJ may not simply reject the opinion. SSR 96–2p. Rather, she must evaluate the opinion's weight by looking at the length, nature and extent of the plaintiff's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p. Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always "give good reasons" for her decision. 20 C.F.R. § 404.1527(d)(2).

*Wates v. Barnhart,* 274 F.Supp.2d 1024, 1034 (E.D.Wis.2003).

The Commissioner concedes that the ALJ failed to discuss this report but notes that ALJs are not required to discuss every piece of evidence. Further, the Commissioner states that the ALJ did discuss the treatment Dr. Yoder provided and reasonably accommodated any restrictions Yoder imposed by limiting plaintiff to a less demanding range of light work.

■ While it is true that "an ALJ need not provide a complete written evaluation of every piece of testimony and evidence," *Diaz,* 55 F.3d at 308, an ALJ may not completely ignore the report of a treating source, *Henderson v. Barnhart,* 205 F.Supp.2d 999, 1013 (E.D.Wis.2002). When an ALJ fails to discuss such an important piece of evidence he not only

fails to "give good reasons" for his decision as required by the regulations, 20 C.F.R. § 404.1527(d)(2), he makes it impossible for the reviewing court to tell whether the evidence was rejected or simply overlooked. *Zblewski v. Schweiker,* 732 F.2d 75, 78–79 (7th Cir.1984); *see also Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir.2003) (stating that while the ALJ need not discuss every piece of evidence in the record, he may not ignore evidence that is contrary to his ruling; otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence); *Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir.2003) (stating that where important evidence is unmentioned by ALJ, court is left to wonder whether it was even considered); *Zurawski,* 245 F.3d at 888 (stating that it is incumbent upon an ALJ to discuss evidence contrary to the Commissioner's position); *Godbey v. Apfel,* 238 F.3d 803, 808 (7th Cir.2000) ("While the ALJ need not articulate his reasons for rejecting every piece of evidence, he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."). And, while the court need not remand in search of a perfectly drafted opinion, where the ALJ's decision leaves the reviewing court with reservations as to whether an issue was fully addressed, the court should reverse. *See Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir.2002).

■ In the present case, while the ALJ did discuss some of the treatment Dr. Yoder provided, he did not discuss or accommodate the limitations contained in Dr. Yoder's September 1998 report. The ALJ's RFC determination does not restrict plaintiff from overhead work or other tasks that could impact plaintiff's shoulder condition. Thus, while the ALJ did restrict plaintiff from a full range of light work, he did not impose restrictions con-

sistent with Dr. Yoder's opinion or explain why that opinion lacked credibility. This omission is all the more striking due to the fact that Dr. Jankus also restricted plaintiff from performing overheard work.[10] The ALJ credited Dr. Jankus's report except for the limitation on overhead work, but he provided no explanation for his rejection of this aspect of Jankus's opinion. (Tr. at 28.) Thus, the matter must be remanded for consideration of Dr. Yoder's September 1998 report.[11] The ALJ may conclude that the report also requires reconsideration of Dr. Jankus's limitation on overhead work.

### 3. ALJ's Analysis of Medical Evidence

■ Plaintiff next objects to the ALJ's evaluation of the other medical evidence. He argues that the ALJ did not discuss evidence favorable to him, and that the ALJ improperly rejected treating source opinions because they conflicted with each other and were based on his subjective complaints. The Commissioner responds that it is the ALJ's job to weigh the evidence and resolve conflicts therein, and that the court may not substitute its judgment for the ALJ's.

While the ALJ's general discussion of the medical evidence seems to highlight the positives of plaintiff's condition and downplay the negatives,[12] a court should not reverse based simply on the tenor of a decision. However, plaintiff's more specific objections are well-taken.

Plaintiff contends that the ALJ improperly evaluated the opinions of Drs. Rosler and Heydarpour. Dr. Rosler's opinion was rejected because he only examined plaintiff twice between June 9 and June 30, 1998. (Tr. at 29.) Presumably, by this the ALJ meant that Rosler was not a treating source, and thus, his opinion was not entitled to special weight. Pursuant to 20 C.F.R. § 404.1502:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an accept-

---

10. Drs. Bussan and McDermott also stated that plaintiff should avoid frequent overhead reaching. (Tr. at 315, 326.)

11. The Commissioner notes that this report was apparently solicited by plaintiff's lawyer. However, I am aware of no authority for the proposition that reports prepared for lawyers may be given no consideration.

12. For example, the ALJ stated that Dr. Bergman opined that plaintiff's "overall condition 'improved'" during treatment. (Tr. at 19.) However, a review of Dr. Bergman's notes

reveals that plaintiff usually noted little or no improvement or worsening of his symptoms. (Tr. at 202–49, 189–91, 194–97.) The ALJ's characterization of plaintiff's condition under Dr. Bergman was simply off base. At one point, the ALJ also stated that plaintiff reported improvement in his condition to Dr. Heydarpour. (Tr. at 21.) This was also a skewed analysis. As indicated in the above review of Dr. Heydarpour's records, plaintiff's condition followed a predictable pattern: he would receive an injection, experience transient improvement, then return complaining of recurrent pain.

able medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

I cannot conclude that the ALJ erred in finding that Dr. Rosler was not a treating source under this standard. But that does not mean that the ALJ may give his opinion short shrift. Dr. Rosler was still an examining source. *See* 20 C.F.R. 404.1527(d)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."); *see also Moore v. Commissioner of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir.2002) (stating that ALJ can only reject an examining physician's opinion for reasons supported by substantial evidence in the record).

The ALJ provided two reasons for rejecting Dr. Rosler's opinion: (1) he did not perform a functional capacity evaluation and (2) there was no objective evidence supporting Dr. Rosler's view that plaintiff would have to lie down for 30 minutes each work day or would be absent twice per month due to his impairments. Regarding the first reason, neither the ALJ nor the Commissioner cite any authority for the proposition that such an evaluation must be performed in order for the physician's opinion to be given any credence. Indeed, the ALJ afforded substantial weight to the opinion of consulting physician Dr. Jankus, despite that fact that Jankus also did not perform a functional capacity evaluation. Regarding the second reason, it is difficult to discern what sort of evidence the ALJ

wanted to see. Clearly, there was objective evidence in the form of MRIs and other diagnostic testing that plaintiff suffered from impairments of the spine, shoulder, elbow and knee likely to cause severe pain. *See* 20 C.F.R. § 404.1529(a). The records of Drs. Bryant, Bergman, Yoder, Heydarpour and Reddy all confirm the existence of impairments that could cause work absences or the need to lie down due to pain.[13]

For example, Dr. Bergman's records include reference to a lumbar MRI completed on August 28, 1996, which revealed disc bulging at L4–5 and L5–S1 (Tr. at 200–01), and a cervical MRI which revealed "moderate to severe right-sided neural foramen narrowing due to uncal osteophyte formation and some right ventral spinal canal osteophytic ridging" at C5–6. (Tr. at 192.) The MRI also showed a herniated disc at C6–C7. (Tr. at 192–93.) Dr. Bryant reviewed the films and confirmed the presence of these impairments. (Tr. at 271–72.) An August 16, 1997 cervical MRI, included with Dr. Heydarpour's notes, revealed multilevel degenerative disc disease, with a moderate disc herniation at C6–7, severe bony right-sided lateral spinal stenosis at C5–6, and moderate left-sided lateral spinal stenosis at C3–4, C4–5 and C5–6. (Tr. at 308.) Dr. Yoder's records contain reference to an MRI of plaintiff's right shoulder revealing a rotator cuff tear. (Tr. at 179–80.) Records from Elmbrook Memorial Hospital refer to an MRI of plaintiff's left knee showing a tear of the posterior horn of the medial meniscus, which Dr. Yoder surgically repaired. (Tr. at 377–78.) Clearly, there was an abundance of objective evidence. Thus, the ALJ failed to provide adequate reasons for rejecting Dr. Rosler's opinion.

13. I note that Dr. Heydarpour also opined that plaintiff could not get through an eight hour day without lying down and that he would be absent from work more than twice per month. (Tr. at 392–93.)

The ALJ concluded that Dr. Heydarpour was a treating source, but nevertheless rejected his opinion because is was "not supported by, or consistent with, the objective medical evidence." (Tr. at 29.) I first note that this is not the standard.

> Pursuant to Ruling 96–8p, the ALJ must give controlling weight to the treating source's opinion if it is "not inconsistent" with other substantial evidence in the record; the opinion need not, as the ALJ stated, be "consistent" with the record. This is not merely a semantic issue. The "not inconsistent" standard presumes the opinion's prominence and requires the ALJ to search the record for inconsistent evidence in order to give the treating source's opinion less than controlling weight. Under the standard imposed by the ALJ, the opinion only has controlling weight if the record supports it.

*Dominguese*, 172 F.Supp.2d at 1100 (internal citation omitted). Further, even if the ALJ finds that a treating source opinion is not entitled to controlling weight, the ALJ may not simply reject the opinion. SSR 96–2p. He still must evaluate the opinion's weight under the factors set forth in 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p. "Regardless of the weight the ALJ ultimately gives the treating source opinion, the ALJ must 'give good reasons' for his decision." *Dominguese*, 172 F.Supp.2d at 1100 (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ failed to give good reasons here. First, he did not consider the factors set forth in § 404.1527(d)(2). Dr. Heydarpour saw or spoke to plaintiff almost weekly for a two year period of time. *See* 20 C.F.R. § 404.1527(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). The treatment notes reveal that Dr. Heydarpour obtained a deep understanding of plaintiff's condition during this time. *See* 20 C.F.R. § 404.1527(d)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.").

Second, none of the specific reasons the ALJ provided for rejecting this opinion withstand scrutiny. The ALJ first stated that Dr. Heydarpour's assessment concerning plaintiff's manipulative functioning differed from that of Dr. Rosler, and that Dr. Rosler had performed certain testing Dr. Heydarpour had not. In his December 17, 1998 report Dr. Heydarpour stated that plaintiff was not limited in his ability to grasp, turn or twist objects, or in fine manipulation. However, he found that plaintiff was significantly limited in his ability to reach, including overhead. (Tr. at 392.) In his September 17, 1998 report, Dr. Rosler opined that plaintiff had significant limitations in his ability to grasp, turn or twist objects with both hands, and had significant limitations in fine manipulation with his left hand. He agreed with Dr. Heydarpour that plaintiff was significantly limited in his ability to reach, including overhead, with both hands. (Tr. at 372.) Thus, there were some differences in the two reports, but the ALJ never explained the significance of those differences. Moreover, the ALJ previously rejected Dr. Rosler's opinion; thus, it is difficult to see how any differences between Drs. Rosler and Heydarpour would negatively impact on Heydarpour's credibility. The ALJ did not cite any other reliable, contrary medical evidence in order to cast doubt on Dr. Heydarpour's conclusions. Nor did the ALJ explain why the fact that Dr. Rosler performed certain tests while Dr. Heydarpour did not meant that Dr. Heydarpour's opinion should be rejected.

The second reason provided by the ALJ was that Dr. Heydarpour's notes were essentially void of any objective medical findings but rather contained little more than plaintiff's subjective complaints and requests for more pain medication or epidural injections. This finding was unsupported. First, Dr. Heydarpour's records contain MRI results showing that plaintiff suffered from multilevel degenerative disc disease, with a moderate disc herniation at C6–7, severe bony right-sided lateral spinal stenosis at C5–6, and moderate left-sided lateral spinal stenosis at C3–4, C4–5 and C5–6. (Tr. at 308.) Clearly, this was objective evidence supporting plaintiff's complaints of pain. Second, physicians are entitled to rely on their patient's descriptions of their conditions. A " 'patient's report of complaints, or history, is an essential diagnostic tool.' " *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir.2003) (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir.1997)); *see also Alexander*, 287 F.Supp.2d at 967 (citing Mary Sue Henipen et al., *Reference Guide on Medical Testimony*, in *Federal Judicial Center, Manual on Scientific Evidence* 452–53 (2d ed.2000)) (stating that it is widely accepted that information obtained from the patient is one of the primary and most useful tools in arriving at a conclusion about a patient's condition). Third, Dr. Heydarpour observed on examination that plaintiff had to reposition himself while sitting, that he had reduced range of motion, and that he had difficulty walking on his toes and heels due to pain. (Tr. at 176.) These are not simply restatements of plaintiff's complaint but rather the observations of a treating doctor. Finally, it would appear that the fact that plaintiff consistently sought pain medication would bolster plaintiff's claim that he suffered from disabling pain.

The third reason provided by the ALJ was that Dr. Heydarpour did not perform a functional capacity evaluation. But as with Dr. Rosler's opinion, no authority is provided for holding this against Dr. Heydarpour, especially when the report the ALJ *did* credit was prepared by a physician (Dr. Jankus) who also did not perform a functional capacity evaluation.

Finally, the ALJ noted that Dr. Schultz disagreed with Dr. Heydarpour's treatment methods. But the ALJ did not state that Dr. Schultz held a contrary view as to plaintiff's physical abilities. Disagreement over treatment modalities would seem to have little or nothing to do with the validity of Dr. Heydarpour's assessment of plaintiff's functional capacity. Thus, while this was an accurate observation of the evidence by the ALJ, the ALJ failed to build a bridge from this observation to his conclusion.

Thus, for all of these reasons, I conclude that the ALJ failed to properly evaluate the opinions of plaintiff's treating and examining physicians. The matter must be remanded for reconsideration.

## B. Mental Impairment

Plaintiff's second argument is that the ALJ erred in finding that his mental impairment was not severe. An impairment is severe if it significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c),1521(a). Basic work activities mean the abilities and aptitudes necessary to do most jobs. Examples include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b). An impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85–28. An impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the claimant's statement of symptoms. 20 C.F.R. § 404.1508; *see also* SSR 85–28 (stating that the determination of whether an impairment is severe is made based on medical considerations alone).

The regulations prescribe a "special technique" for evaluating mental impairments. 20 C.F.R. 404.1520a(a). Under the special technique, the ALJ must first evaluate the claimant's pertinent symptoms, signs and laboratory findings to determine whether he has a medically determinable mental impairment(s). § 404.1520a(b)(1). If so, the ALJ must then rate the degree of functional limitation resulting from the impairment(s). § 404.1520a(b)(2). To do this, the ALJ rates the degree of functional limitation based on the extent to which the claimant's impairment(s) interferes with his ability to function independently, appropriately, effectively and on a sustained basis. The ALJ considers such factors as the quality and level of the claimant's overall functional performance, any episodic limitations, the amount of supervision or assistance he requires, and the settings in which he is able to function. § 404.1520a(c)(2); *see also* SSR 96–8p ("Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting.").

There are four broad functional areas in which the ALJ rates the degree of functional limitation: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), using a five-point scale: none, mild, moderate, marked and extreme. The degree of limitation in the fourth functional area (episodes of decompensation) is evaluated using a four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 404.1520a(c)(4). If the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, he generally may conclude that the impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. § 404.1520a(d)(1). If the mental impairment(s) is severe, the ALJ will then determine if it meets or is equivalent in severity to a listed mental disorder. § 404.1520a(d)(2). The ALJ must document application of this technique and must include a specific finding as to the degree of limitation in each of the functional areas in his decision. § 404.1520a(e)(2).

Plaintiff does not contend that the ALJ failed to comply with the special technique outlined above, and my review of the ALJ's decision reveals no error of law. Instead, plaintiff argues that the ALJ improperly rejected the medical evidence supporting a finding of a severe mental impairment. The Commissioner responds

that the ALJ reasonably relied on plaintiff's own statements, the opinions of state agency doctors, and the lack of any regular psychotherapy or other treatment in finding no severe mental impairment.

■ In evaluating the ALJ's decision on this issue, I keep in mind that the step two requirement that the claimant have a severe impairment is generally considered to be "a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153–54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (O'Connor, J., concurring)); *see also McDonald v. Sec'y of Health & Human Servs.*, 795 F.2d 1118, 1124 (1st Cir.1986). "Reasonable doubts on severity are to be resolved in favor of the claimant." *Beasich v. Comm'r of Soc. Sec.*, 66 Fed. Appx. 419, 428 (3d Cir.2003). As noted, the step two determination should be based on medical considerations.

■ The ALJ gave several reasons for finding plaintiff's depression not severe. First, he noted that plaintiff stated in his daily activities questionnaire that going to a comedy club was better medicine than the drugs prescribed by his doctors; as soon as he started laughing, he felt better. However, the ALJ never explained how this means plaintiff's depression is not severe.[14]

Second, the ALJ stated that he relied upon the report of state agency consultant Dr. Mahlberg, who found that plaintiff did not have a severe impairment. However,

the Seventh Circuit has made clear that an "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir.2003) (citing *Moore v. Commissioner of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir.2002)).

The reports of the examining physicians show that plaintiff had a severe impairment. Dr. Nagy examined plaintiff and concluded that he had a history of major depression, recurrent, and was currently suffering from major depression. He estimated a GAF of 55–60, which meant that plaintiff's symptoms were moderate, and that he would have moderate difficulty in social, occupational or school functioning. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* 34 (2000). Dr. Nagy's assessment was corroborated by that of therapist Michael Wallace, who treated plaintiff for depression and estimated a GAF of 51.[15] Dr. Yanchar examined plaintiff and found that his affective range was "blunted and flat." (Tr. at 376.) "On tasks of memory and concentration there appear[s] to be diminished ability to concentrate." (Tr. at 376.) Dr. Zarwell examined plaintiff and prescribed Ambien. (Tr. at 289.) Dr. Yoder also noted plaintiff's complaints of depression. (Tr. at 253.) In light of this evidence, it is difficult to conclude that the ALJ's finding, supported medically only by a non-examining physician, was supported by substantial evidence.

---

14. The ALJ cited hearing exhibit 5E, which was the daily activities questionnaire plaintiff filled out on application for benefits. (Tr. at 105–111.) The report is faint and difficult to read, but it does appear to refer to a trip to a comedy club during which plaintiff "started to laugh and felt pretty good." (Tr. at 107.) On the next page plaintiff states that laughter "is best medicine for depression not zombie [?] drugs." (Tr. at 108.)

15. The Magistrate Judge noted that the caselaw does not require ALJs to base their findings on GAF scores. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir.2002). However, an examining physician's assessment of the claimant's ability to function cannot be ignored, particularly at step two.

Third, the ALJ stated that plaintiff had not received regular therapy or other treatment. Courts have repeatedly questioned the validity of a lay ALJ's observation that the plaintiff's frequency of treatment was insufficient to show a disabling mental condition. *See, e.g., Beasich,* 66 Fed. Appx. at 429 (quoting *Van Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir.1996)) ("[C]ourts have questioned the relevance of infrequent medical visits in determining when or whether a claimant is disabled. The fact that a 'claimant may be one of the millions of people who did not seek treatment for a mental disorder until late in the day' is not a substantial basis to reject that an impairment existed."); *Blankenship v. Bowen,* 874 F.2d 1116, 1124 (6th Cir.1989) ("Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."); *see also Dominguese,* 172 F.Supp.2d at 1096 (rejecting ALJ's characterization of plaintiff's doctor visits as infrequent where there was no medical evidence as to how often a patient with claimant's condition should see the doctor). In any event, the ALJ's observation ignored the evidence that plaintiff sought therapy from two different sources and was on several occasions prescribed medications for mental illness.

Fourth, the ALJ found that plaintiff did not have any restrictions in activities of daily living based on plaintiff's statements that he infrequently did household cleaning, laundry, and cooking, and could perform "a little" yardwork. (Tr. at 24–25.) The ALJ never explained how these minimal activities supported his conclusion.

*Cf. Clifford,* 227 F.3d at 872 (stating that minimal daily activities do not establish that a person is capable of engaging in substantial physical activity). Neither did the ALJ explain how the fact that plaintiff "went out and ate fast food weekly" supported his conclusion. (Tr. at 25.)

Finally, despite acknowledging Dr. Yanchar's observation that plaintiff had a diminished ability to concentrate, the ALJ found that plaintiff "seldom" had difficulties in concentration, persistence and pace. (Tr. at 25.) No medical or other evidence was cited in support of this finding.

Thus, I am left with significant doubt as to whether the ALJ's step two finding as to plaintiff's mental impairment was supported by substantial evidence. Given the de minimis nature of this requirement, the ALJ should have proceeded with the inquiry. The Commissioner argues that even if this was error it was not reversible error because, having found another severe impairment, the ALJ continued with the sequential evaluation process. When determining RFC, the ALJ must consider the impact of all impairments, severe or not. SSR 96–8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). However, in the present case the ALJ based his RFC assessment only on plaintiff's "cervical and lumbar difficulties." (Tr. at 30.) Thus, even if the ALJ properly found that this impairment was not severe at step two, he erred in not considering any effects of plaintiff's depression in determining RFC.[16] *See* SSR 96–8p (discussing requirements for mental RFC determination, and stating that the mental RFC assessment used at steps four and five of the sequential evaluation pro-

---

**16.** Neither did the ALJ factor any mental limitations into the hypothetical question he asked the VE. *See Grecol v. Halter,* 46 Fed. Appx. 773, 777–78 (6th Cir.2002) (reversing where hypothetical did not refer to claimant's depression due to chronic pain, with GAF of 50).

cess requires a more detailed assessment than step two severity rating). Therefore, the matter must be reversed and remanded for re-consideration.

## C. ALJ's Credibility Determination

 Plaintiff next argues that the ALJ erred in evaluating the credibility of his testimony. Generally, the court must defer to the ALJ's credibility determination because the ALJ had the opportunity to personally observe the claimant at the hearing. *Wates,* 274 F.Supp.2d at 1038; *see also Ehrhart v. Sec'y of Health & Human Servs.,* 969 F.2d 534, 541 (7th Cir.1992). However, when the ALJ's credibility determination rests on objective factors rather than subjective considerations such as a claimant's demeanor, appellate courts have greater freedom to review the ALJ's decision. *Id.* (citing *Clifford,* 227 F.3d at 872). Further, the court need not defer to a credibility determination based on a misstatement or misunderstanding of the evidence. *Id.* (citing *Sarchet,* 78 F.3d at 307–08). Finally, the ALJ must comply with the Commissioner's Rulings and Regulations in evaluating credibility. *Id.*

> In evaluating a claimant's subjective complaints of pain, the ALJ must first determine whether the pain alleged is substantiated by objective medical evidence. 20 C.F.R. § 404.1529. If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. Social Security Ruling 88–13, ("SSR 88–13"). She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. SSR 88–13. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.

*Luna,* 22 F.3d at 687; *see also* SSR 96–7p.

 The ALJ acknowledged the factors he had to consider in evaluating credibility (Tr. at 25), and plaintiff does not contend otherwise. However, plaintiff faults the ALJ for relying on descriptions of daily activities that bear little relation to his ability to work.

The ALJ provided several reasons for finding plaintiff's "subjective complaints and allegations ... not fully credible." (Tr. at 27.) First, he noted a possible conflict between plaintiff's daily activities report, in which plaintiff stated that he had stopped taking medications due to adverse side effects (Tr. at 106) and plaintiff's "pain report," in which plaintiff did not state that he had stopped taking pain medications (Tr. at 114). I see no real conflict here. The pain report asks when plaintiff began taking medication but not if or when he stopped. (Tr. at 114.) Moreover, the record contains several references to plaintiff's doctors wanting him to reduce his reliance on narcotic pain mediation (*E.g.,* Tr. at 343, 376, 424, 430) and to the side effects of plaintiff's medication (*E.g.,* Tr. at 341, 380). Thus, the fact that plaintiff may have attempted to stop taking pain medication around this time would not seem to impact on the credibility of his testimony that he was suffering from severe pain.[17]

---

**17.** For example, on May 29, 1998, plaintiff told Dr. Schultz that he had gone without Percocet for five or six days but still had neck pain. (Tr. at 420.) On June 17, 1997, plaintiff told Dr. Yoder that he had stopped taking

Second, the ALJ noted that plaintiff's wife stated that he could drive a car, cook and wash dishes. (Tr. at 25.) However, as the ALJ also noted, she also said that he spent most of his time watching television and reading. It is unclear how this evidence impacts on plaintiff's credibility. The ALJ also noted that in his daily activities questionnaire plaintiff said that he could perform household cleaning, cooking and laundry. (Tr. at 26.) However, a review of the exhibit reveals that plaintiff said he cooked "weekly" and cleaned the house "monthly." (Tr. at 108.) He did laundry "not often." (Tr. at 106.) Again, it is unclear how this negatively impacts on plaintiff's credibility.[18]

■■■ Moreover, it is well-established that the ability to do certain minimal daily activities does not mean that the person is able to work. *See,e.g., Clifford,* 227 F.3d at 872 (stating that "minimal daily activities ... do not establish that a person is capable of engaging in substantial physical activity"); *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989) (rejecting ALJ's decision based on plaintiff's statements on a social-security questionnaire, where she admitted she cooked and cleaned, shopped for groceries, did the laundry, visited with friends, attended church, and went fishing, which partially contradicted her later testimony, because "a claimant need not prove she is bedridden or completely helpless to be found disabled"); 20 C.F.R.

§ 404.1572(c) ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity.").

Third, the ALJ noted that plaintiff discontinued taking certain medications because of the side effects. (Tr. at 26.) The ALJ failed to explain how this affected plaintiff's credibility, nor did he consider the propriety of plaintiff's reasons for not taking these medications. *See* SSR 82–59.

Fourth, the ALJ stated that when requesting reconsideration plaintiff alleged that he could not lift anything over five pounds and was unable to drive, yet testified at the hearing that he drove his daughter to school twice per week. (Tr. at 26–27.) However, the document the ALJ cited—Exhibit 10E (Tr. at 148)—contained no such statements.

Fifth, the ALJ suggested that plaintiff may have been improperly seeking out pain medication. (Tr. at 27.) However, the medical evidence does not support the contention. The ALJ cites a line from one of Dr. Bryant's reports, which reads in full: "There was a concern for the patient's current enhanced pain reports and reliance on pain medications and he may require chronic pain management rehabilitation focus, and they would start to initiate a work hardening program." (Tr. at 267.)[19] The ALJ seemed to interpret the

pain medication and was trying biofeedback therapy. (Tr. at 252.)

18. The ALJ also noted that plaintiff once told Dr. Bryant that he had lifted his 30 pound daughter. (Tr. at 27.) However, during the same office visit plaintiff told the doctor that "he was worse." (Tr. at 265.) The note indicated that plaintiff's "physical capacity form indicated he was on his feet only 2 to 5 hours a day and the heaviest thing he had lifted was his 30 lb. daughter." (Tr. at 265.) There was no indication that plaintiff was lifting his child regularly. *See* SSR 96–8p

(stating that "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").

19. The ALJ stated that Dr. Bryant was responding to a report from "some of his [plaintiff's] physicians." (Tr. at 27.) Dr. Bryant indicated that this was a report from Covenant Rehabilitation Services. (Tr. at 267.)

word "enhanced" to mean "exaggerated" but that is not a fair characterization. *Cf. Sarchet,* 78 F.3d at 307 (reversing where ALJ misunderstood medical term "nonspecific" to mean unbelievable). And, as noted above, while several of plaintiff's doctors were concerned with his reliance on heavy narcotics, none suggested that he was not experiencing severe pain. To the contrary, they suggested alternate means of dealing with the pain. The ALJ also cited a notation from social worker Wallace that the possibility that plaintiff was seeking pain medication must be ruled out. (Tr. at 27.) For someone with plaintiff's history, this was surely a legitimate concern for Wallace to have, but the ALJ cited no evidence that plaintiff was found to actually have been engaging in such behavior.

Sixth, the ALJ stated that on May 13, 1997, "Dr. Donald Yoder opined that the claimant's condition was improving. He anticipated that the claimant should be able to return to work activity in about 3–4 weeks." (Tr. at 27.) As noted, Dr. Yoder had performed surgery on plaintiff's shoulder, and this note pertained to that treatment. It reads in full:

> Overall he is making progress. He states that he is not getting a lot stronger. His motion is getting better. Massage would help him for only half hour, after therapy. He is doing home exercises. He doesn't feel he is able to return to work.
>
> He complains of increased discomfort with exercises in abduction, and he still has limitation of internal rotation, but overall, he is making steady and satisfactory progress. He will continue exercises at this time. He will return in 3 weeks, and anticipate return to work shortly thereafter.

(Tr. at 253.) There are several problems with the ALJ using this note to find plaintiff's testimony incredible. First, the note pertained to plaintiff's shoulder, not his neck or back, which were the primary sources of his pain. Second, subsequent notes show that plaintiff was not, in fact, released to return to work in three weeks. Dr. Yoder's June 3, 1997 note indicates that plaintiff's "company had recommended Social Security and he will apply for that." (Tr. at 253.) Dr. Yoder's June 17, 1997 note indicates that plaintiff complained of pain, lack of stamina, and loss of motion. (Tr. at 252.) Third, Dr. Yoder's September 10, 1998 report, which the ALJ overlooked, stated that plaintiff had 12% ppd at the right shoulder. In sum, the ALJ's extraction of one line from Dr. Yoder's records does not support his conclusion as to the credibility of plaintiff's complaints of disabling pain.

Seventh, the ALJ discussed what plaintiff told Dr. Jankus he could do and plaintiff's testimony at hearing as to his capabilities. These statements were essentially consistent. Moreover, the ALJ specifically credited the report of Dr. Jankus, who found plaintiff credible in his description of his abilities. (Tr. at 320.)

> The ALJ concluded:
>
> I find that the claimant's subjective complaints and allegations about his limitations and impairments are not fully credible and, when considered in light of all the objective medical evidence and clinical findings as well as the record as a whole, do not reflect an individual who is so impaired as to be incapable of engaging in any substantial gainful work activity.

(Tr. at 27–28.) As noted, there was objective medical evidence in the form of MRIs and other diagnostic testing showing that plaintiff suffered from abnormalities that reasonably could be expected to produce the pain asserted. 20 C.F.R. 404.1529. Thus, the ALJ's credibility determination, based as it was on "objective" factors rather than on demeanor or other subjective

grounds, need not be afforded great deference. And, for the reasons stated, the evidence the ALJ relied upon was insubstantial and did not logically support his conclusion. Therefore, the matter must be reversed and remanded for this reason as well.

## D. VE Testimony

■■■ Finally, plaintiff argues that the VE's testimony conflicted with the Dictionary of Occupational Titles. However, because the issue was not raised at hearing, the ALJ was entitled to rely on the VE's numbers. *Donahue v. Barnhart,* 279 F.3d 441, 447 (7th Cir.2002).

Plaintiff also argues that the ALJ's hypothetical to the VE did not include, or contain a sufficient explanation of, all of his impairments. As noted above, the ALJ's hypothetical assumed that plaintiff could stand or walk for six out of eight hours, yet the medical report the ALJ credited limited plaintiff to two or three hours per workday on his feet. The hypothetical also did not include any restrictions on plaintiff's ability to work overhead, or perform repetitive pushing and pulling or precise assembly line type activities, limitations found by Dr. Jankus. Thus, the hypothetical question may have been incomplete.

The ALJ's decision must be reversed and remanded. At the new hearing on remand, these additional issues may be addressed with the VE.[20]

20. *See also* n. 9, *supra.*

1. Initially, the complaint in case no. 02–C–370–C named Luis Cancio as a defendant. However, in plaintiffs' consolidated amended complaint, Cancio's name has been deleted and Thomas H. Lee Partners has been added. In addition, plaintiffs deleted the names of Richard Slatten and David Hayes as named plaintiffs. Under Fed.R.Civ.P. 21, plaintiffs

## IV. CONCLUSION

**THEREFORE,** for the reasons stated, I decline to follow the recommendation of the magistrate judge; and

**IT IS ORDERED THAT** the Commissioner's decision is **REVERSED,** and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.